2013 COA 75

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Charles Edward WILSON, Defendant–Appellant.**

**Court of Appeals No. 11CA0009**

Colorado Court of Appeals, Div. VII.

Announced May 23, 2013

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2012.

John W. Suthers, Attorney General, Erin K. Grundy, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Law Office of Gregory Lansky, LLC, Gregory Lansky, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE BERNARD

¶ 1 This appeal raises two issues arising out of a sentencing hearing in a criminal case. First, is a court required to hold a hearing under *People v. Shreck,* 22 P.3d 68 (Colo.2001), before a fingerprint examiner testifies at a sentencing hearing, to determine whether expert testimony about fingerprint comparisons is admissible? We conclude, under the circumstances here, that (1) such a hearing was not required, and, alternatively, (2) any error in denying such a hearing was harmless.

¶ 2 Second, what burden of proof governs the factual sentencing question of whether a defendant was previously convicted of a prior drug-related felony, when such a finding is used to enhance a felony conviction for possession of a controlled substance from a class 6 felony to a class 4 felony, under former section 18–18–405(2.3)(a)? We conclude that the proper burden of proof is a preponderance of the evidence.

¶ 3 Here, defendant, Charles Edward Wilson, appeals the judgment of conviction entered on a jury verdict finding him guilty of possession of a controlled substance and the sentence that the court subsequently imposed. We affirm. In doing so, we also reject defendant's contention that the trial court erred when it denied his request to read the legal definition of "entrapment" to the jury during voir dire.

## I. Background

¶ 4 In May 2008, defendant asked an undercover police officer, who was posing as a prostitute on east Colfax Avenue, if she wanted to smoke crack cocaine with him. He showed her a Blistex tube that contained three rocks of crack cocaine, and police officers from the Aurora Police Department then arrested him.

¶ 5 The prosecution charged defendant with one count of the class 6 felony of possession of a controlled substance. Before trial, the prosecution announced that, if defendant were to be convicted, the prosecution would introduce evidence at the sentencing hearing of defendant's 1997 drug-related felony conviction. The purpose for this evidence was, under former section 18–18–405(2.3)(a), to increase the classification of the conviction from a class 6 felony to a class 4 felony, which would concomitantly increase the possible sentence.

¶ 6 The prosecution endorsed an expert fingerprint examiner to testify at the sentencing hearing. The examiner would provide her opinion that the fingerprints recently taken from defendant matched the fingerprints taken from the person who had been convicted of the 1997 drug-related felony. This testimony would be part of the prosecution's proof that defendant was the person who had been convicted of the 1997 drug-related felony.

¶ 7 Defendant requested that a *Shreck* hearing be held to determine whether the fingerprint examiner's testimony should be admitted at the sentencing hearing. After a hearing, the motions court denied this request.

¶ 8 A second judge presided at defendant's trial and sentencing hearing. The jury convicted defendant of the class 6 felony.

¶ 9 At the sentencing hearing, the trial court allowed the fingerprint examiner to testify as an expert. The fingerprint examiner testified about the methods she used to compare known fingerprints with unknown fingerprints, and she gave her opinion that fingerprint exemplars recently taken from defendant matched the fingerprints associated with the 1997 drug-related felony. Defendant's counsel cross-examined the fingerprint examiner about the reliability of her methods.

¶ 10 The trial court found that the prosecution had proved, by a preponderance of the evidence, that defendant had been convicted of the 1997 drug-related felony. The court increased the class of the conviction to a class 4 felony. After finding that extraordinary mitigating circumstances existed, the court sentenced defendant to eighteen months in prison.

## II. The Trial Court Properly Refused to Offer an Entrapment Instruction During Voir Dire

### A. Standard of Review

¶ 11 We review a trial court's decision to limit voir dire for an abuse of discretion. *People v. Collins,* 730 P.2d 293, 300 (Colo. 1986) ("The propriety of questions to potential jurors on voir dire is within the discretion of the trial court, and its ruling thereon will not be disturbed on appeal unless an abuse of that discretion is shown.").

### B. Discussion

¶ 12 To receive a fair trial, the defendant must be tried by an impartial jury. *Id.* The purpose of voir dire is to allow counsel "to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent [the defendant] from receiving a fair trial." *People v. Rodriguez,* 914 P.2d 230, 255 (Colo.1996)(quoting *People v. O'Neill,* 803 P.2d 164, 169 (Colo.1990)).

¶ 13 A trial court, therefore, may appropriately limit voir dire. Crim. P. 24(a)(3) ("The court may limit or terminate repetitious, irrelevant, unreasonably lengthy, abusive or otherwise improper examination."). For example, a trial court may limit voir dire to prevent an attorney from "instruct[ing] the jury regarding the law or the defendant's theory of the case." *People v. Lybarger,* 790 P.2d 855, 859 (Colo.App.1989)(citing *People v. Shipman,* 747 P.2d 1, 3 (Colo.App.1987)), *rev'd on other grounds,* 807 P.2d 570 (Colo.1991); *see also People v. Maestas,* 701 P.2d 109, 110 (Colo. App.1985). This is because "[t]he knowledge or ignorance of prospective jurors concerning questions of law is generally not a proper subject of inquiry for voir dire since it is presumed that the jurors will be adequately informed as to the applicable law by the instructions of the court." *Collins,* 730 P.2d at 301.

¶ 14 Here, the trial court permitted defense counsel to question the jurors about

their biases and their willingness "to accept the basic principles of criminal law." *People v. Lefebre*, 5 P.3d 295, 299 (Colo.2000). Nevertheless, defendant argues that voir dire was insufficient because the trial court refused his request that the court read to the potential jurors a legal definition of the defense of entrapment. He argues that,

> without the prospective jurors knowing and understanding what constitutes the defense of entrapment, including their concepts of proclivity and predisposition and whether they possessed an assumed predisposition of [defendant], it was impossible for [defendant] to be aware of their biases and/or prejudices for the entrapment defense.

We disagree for two reasons.

¶ 15 First, as was presumed in *Collins*, the record reflects that the jurors in this case were adequately informed at the proper time—at the close of evidence—of the governing law. *See Collins*, 730 P.2d at 301. And defendant does not challenge the instructions on the issue of entrapment that the trial court ultimately gave to the jury.

¶ 16 Second, contrary to defendant's assertion, the trial court permitted his counsel to question the jurors thoroughly about their views on the defense of entrapment. During the prosecution's voir dire, defense counsel objected and asked the court to "read the legal definition of entrapment." The court then stated:

> I'm going to limit the voir dire on that issue because it's going to make a great deal of difference what the court rules in the course of the trial. So I'm going to *ask counsel to just basically talk about the general law, which has really been talked about at this point, and if the jurors could follow the legal definition given by the court,* and then the court will give those legal definitions and the jury will be sworn to follow the legal principles based on the factual situation that I find. So I'm going to ask you to conclude that discussion. [Defense counsel] is under the same admonition.

(Emphasis supplied.)

¶ 17 Defense counsel questioned the jurors on their views on the entrapment defense.

This general questioning led one juror to reveal his unwillingness to follow the trial court's instructions, *see Lefebre*, 5 P.3d at 299:

> [Defense counsel]: What do you think about that notion that I can say, ["]Hey, so somebody can go commit a crime, commit all the elements of that crime, but if they were entrapped then the law requires that they be found not guilty["]? Does that seem fair to you?
>
> [Juror M]: Not really.
>
> [Defense counsel]: Tell me why.
>
> [Juror M]: Because if someone did all the elements, I mean murder—if someone murdered someone, and it was entrapment, I mean they still did that so I don't know. It seems like they should still pay for the crime.
>
> [Defense counsel]: So you would have—
>
> [Juror M]: Entrapment or not, I guess you consciously are doing what you are doing.

Both the prosecutor and defense counsel later agreed that juror M should be dismissed for cause.

¶ 18 Defense counsel also questioned other jurors about the general nature of the entrapment defense.

¶ 19 The trial court subsequently prevented defense counsel from exploring a particular factual hypothetical that was not relevant to this case:

> [Defense counsel]: Let's say there is a murder.
>
> [Juror C]: Um-hum.
>
> [Defense counsel]: You find out that the murder was committed after a police officer went to the defendant's house and said, "If you don't murder this person, I'm going to kill the rest of your family."
>
> [Juror C]: See, that would play into all of the evidence and everything else. Yes, I would have to weigh that as well as the evidence. And I would have to make a decision based on that.
>
> [The Court]: The court had limited both sides to—that's a hard to understand hypothetical. Would you be able to[,] un-

der the circumstances[,] to follow—if the court gave you an instruction on entrapment, would you be able to go through each of those elements that are entrapment to see if in your mind the district attorney had produced enough evidence that proved beyond a reasonable doubt that what was done was not entrapment? [Juror C]: Yes, based on what I'm given, yes.

[The Court]: I think that is part of the criteria for fairness and impartiality.

[Defense counsel]: Judge, I would renew my request that the venire be advised of the elements of entrapment.

[The Court]: Okay. I told you I won't.

¶ 20 As in *Collins,* the trial court properly limited the scope of voir dire, including placing limitations on the irrelevant hypothetical that defense counsel attempted to use, as the voir dire related to the nuances of the entrapment defense. *See Collins,* 730 P.2d at 300; *see also Lybarger,* 790 P.2d at 859. And, again as in *Collins,* the trial court allowed the prosecutor and defense counsel to ask general questions about whether the potential jurors would follow the court's instructions on entrapment. *See Collins,* 730 P.2d at 301.

¶ 21 This questioning was effective to determine whether any potential jurors possessed any beliefs that would cause them to be biased in such a way that defendant would not receive a fair trial. *Rodriguez,* 914 P.2d at 260; *see Collins,* 730 P.2d at 300. Accordingly, we conclude that the trial court's denial of defendant's request to instruct the jury on the defense of entrapment during voir dire was not an abuse of discretion.

III.  The Motions Court Did Not Abuse Its Discretion When It Denied Defendant's Motion to Hold a *Shreck* Hearing

A.  Standard of Review

■  ¶ 22 Relevant scientific, technical, or other specialized knowledge is admissible if it will assist the trier of fact. CRE 702. In determining admissibility of expert testimony, a trial court employs a *Shreck* analysis, which requires that: (1) the scientific principles underlying the testimony

are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury [or fact finder]; and (4) the evidence satisfies CRE 403.

*People v. Rector,* 248 P.3d 1196, 1200 (Colo.2011)(citing *Shreck,* 22 P.3d at 77–79); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "The purpose of a CRE 702 inquiry is to determine whether the proffered scientific evidence is reliable and relevant, and for the trial court—acting as a gatekeeper—to prevent the admission of 'junk science.'" *Estate of Ford v. Eicher,* 220 P.3d 939, 942 (Colo.App.2008) (quoting *Elsayed Mukhtar v. California State Univ.,* 299 F.3d 1053, 1063 (9th Cir.2002)), *aff'd,* 250 P.3d 262 (Colo.2011).

■  ¶ 23 Once a party requests a *Shreck* analysis, a trial court may, in its discretion, determine whether an evidentiary hearing would be helpful. *Rector,* 248 P.3d at 1201. If the trial court already has sufficient information to make specific findings under *Shreck,* a hearing is not necessary. *Id.* "This discretion comports with the trial court's need to '*avoid unnecessary* ["]*reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted,* and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.'" *Id.* (emphasis supplied) (quoting in part *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

■  ¶ 24 Moreover, we review any error in denying a *Shreck* hearing under the nonconstitutional harmless error standard. *People v. Fasy,* 813 P.2d 797, 799 (Colo.App. 1991), *rev'd on other grounds,* 829 P.2d 1314 (Colo.1992); *see* CRE 103(a); *see also People v. Stewart,* 55 P.3d 107, 124 (Colo.2002) (applying nonconstitutional harmless error analysis where the trial court improperly admitted expert testimony in the guise of lay testimony). An error is harmless if a reviewing court can say with fair assurance that, in light of the entire record, the error did not substantially influence the verdict or impair

the fairness of the trial. *Stewart,* 55 P.3d at 124.

## B. Discussion

¶ 25 As noted above, defendant filed a motion challenging the proposed testimony of the fingerprint examiner. This motion relied only on the first and second prongs of the *Shreck* analysis. It argued that the technique of fingerprint analysis was insufficiently reliable to be admissible and that the fingerprint examiner was not adequately qualified to provide an expert opinion. The motion asserted, among other things, that (1) fingerprint analysis is not a science; (2) "[t]here is no private sector application of fingerprint comparison"; (3) "[t]here are numerous anecdotal examples of false fingerprint identifications"; (4) the fingerprint examiner did not have a bachelor's degree in any scientific field; and (5) the fingerprint examiners employed by the Aurora Police Department were not certified by any recognized professional organization, and their work was not regularly checked for accuracy by independent testing.

¶ 26 The motions court held a hearing on this motion, and, at its conclusion, determined that a *Shreck* hearing was unnecessary. In doing so, the court relied primarily on section 18–1.3–802, C.R.S. 2012, which provides that "fingerprints that are part of the record of ... former convictions and judgments, or are part of the records kept at the place of [a] party's incarceration ... *shall be prima facie evidence of the identity of such party and may be used in evidence against him or her*" (emphasis supplied). *See also People v. Kyle,* 111 P.3d 491, 504 (Colo.App.2004) ("Offering evidence of fingerprint cards and expert testimony linking those prints to the defendant is one valid method for proving the identity of the defendant.").

¶ 27 The motions court stated:

I am going to deny the motion at this time. I'm going to find that although it's an interesting argument and it may be that a *Shreck* hearing should be held as to whether a particular person reviewing fingerprints should be certified, whether there should be some certification process, whether there should be peer review, although it's an interesting argument, it's not been addressed prior [sic] in the courts. And I am not going to change the current state of the statute at this time so that motion is denied. And I'll note just among us that on CSI they can do it with a computer so that must be reliable.

¶ 28 After the jury had convicted defendant, the trial court conducted a sentencing hearing to determine whether the prosecution could prove that defendant had been convicted of the 1997 drug-related felony. The prosecutor questioned the fingerprint examiner on her methods and past practices, including questions whether those methods were reliable and whether she had consistently applied them accurately in her work. Rather than questioning the examiner about her expert qualifications, defendant's counsel stated that he would rely on the pretrial motion as the objection to her testimony.

¶ 29 The trial court allowed the fingerprint examiner to testify as an expert "[b]ased upon the prior ruling [by the motions court] and the testimony today." After the examiner testified that the comparison of the fingerprints established that defendant's fingerprints were identical to those of the person who had been convicted of the 1997 drug-related felony, defendant's counsel cross-examined her about her methods, their scientific reliability, and whether she had applied them accurately.

¶ 30 We conclude, for the following reasons, that the motions court acted within its discretion when it denied defendant's request for a *Shreck* hearing.

¶ 31 First, the trial court, not a jury, was the finder of fact that would evaluate the fingerprint examiner's testimony. Although the requirements found in CRE 702 and *Shreck* apply to bench trials, the predominant concern—that "junk science" will taint a jury—is not at issue when the finder of fact is a judge. *See Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 760 (7th Cir.2010)("[T]he usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in [a bench trial], and our review must take this factor into consid-

eration."); *Att'y Gen. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir.2009) ("[W]hile *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial."); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir.2004)("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial.").

¶ 32 Second, defendant effectively received the same protections that a *Shreck* hearing would have granted him because, during the sentencing hearing, he was allowed to raise the sorts of issues that would have been discussed in a pretrial hearing concerning the first and second prongs of the *Shreck* test. The fingerprint examiner testified about her methods and their reliability, and defendant's counsel cross-examined her about this testimony. For example, the fingerprint examiner testified:

● In this case, she examined "ten-print" samples from the 1997 drug-related felony and defendant's present case. These "ten-print" samples "are fully[-]rolled ten fingers on a fingerprint card."

● Unlike latent prints from crime scenes, which are often fragmented, "ten-print" samples contain "a lot more information that is available to compare."

● She had over thirty years of experience examining fingerprints and had compared hundreds of thousands of fingerprint samples.

● She also certified other fingerprint examiners as part of a larger professional organization.

● Courts had qualified her to testify as an expert fingerprint examiner more than seventy-five times before this case.

● She had attended numerous courses and training programs as part of her job.

¶ 33 Third, examination of complete sets of fingerprints, such as those here, is often easier, and presents fewer challenges, than the examination of partial latent fingerprints that are often found at crime scenes. *See, e.g., United States v. Baines*, 573 F.3d 979, 981–82, 986 (10th Cir.2009) (explaining the difference between known and latent finger-

prints; "defendant contends that the government failed to show that the process for latent fingerprint identification has been tested"); *United States v. Mitchell*, 365 F.3d 215, 220–21 (3d Cir.2004) ("Criminals generally do not leave behind full fingerprints on clean, flat surfaces. Rather, they leave [latent fingerprint] fragments that are often distorted or marred by artifacts.... [T]he problems with latent prints are more acute [than the problems with rolled "ten-print" fingerprints] because [latent fingerprints] are smaller, and left more carelessly than full-rolled prints, and are left on surfaces that many other fingers have also touched."); *Commonwealth v. Patterson*, 445 Mass. 626, 629, 840 N.E.2d 12, 16 (2005)("[B]ecause latent print impressions left at crime scenes are often partial impressions of a full fingerprint, subject to significant distortions, it is a question of significant dispute as to how much detail in the latent print must be demonstrable to assert reliably its identity with a known fingerprint.").

¶ 34 Fourth, this case clearly falls within the category of "ordinary cases where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167; *accord United States v. John*, 597 F.3d 263, 274 (5th Cir. 2010)("[W]e agree with a number of our sister circuits that have expressly held that in the context of fingerprint evidence, a *Daubert* hearing is not always required."); *Mitchell*, 365 F.3d at 256 (a district court may refuse to hold a *Daubert* hearing if the defendant does not raise a novel challenge to the admissibility of latent fingerprint identification testimony); *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) (in the context of expert testimony about fingerprint evidence, "[u]nder *Daubert*, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered"); *United States v. Havvard*, 260 F.3d 597, 600 (7th Cir.2001)(observing that some courts "have declined to conduct a pretrial *Daubert* hearing on the admissibility of fingerprint evidence or have issued brief opinions asserting that the reliability of fingerprint comparisons cannot be questioned") (citations omitted).

¶ 35 Fifth, as the motions court noted, section 18–1.3–802 is a legislative statement that fingerprint comparisons are "prima facie evidence of the identity of [a] party and may be used in evidence." Thus, the legislature has determined that fingerprint comparisons are reliable evidence for the purposes of sentencing hearings like that held here.

¶ 36 Sixth, courts in other jurisdictions have concluded that fingerprint comparisons are reliable evidence. *See, e.g., United States v. Pena,* 586 F.3d 105, 110 (1st Cir.2009) ("Numerous courts have found expert testimony on fingerprint identification based on [a particular] method to be sufficiently reliable under *Daubert.*"); *Baines,* 573 F.3d at 989–92 (admitting expert fingerprint testimony after reviewing the *Daubert* factors, and noting that "[f]ingerprint identification has been used extensively by law enforcement agencies all over the world for almost a century," such identification has an "impressively low" error rate, and it has achieved "overwhelming acceptance" by experts in the area); *United States v. Abreu,* 406 F.3d 1304, 1307 (11th Cir. 2005) ("We agree with the decisions of our sister circuits and hold that the fingerprint evidence admitted in this case satisfied *Daubert.*"); *Mitchell,* 365 F.3d at 246 (same as *Baines* ); *United States v. Llera Plaza,* 188 F.Supp.2d 549, 572 (E.D.Pa. 2002)("[T]o postpone present in-court utilization of this 'bedrock forensic identifier' pending . . . research would be to make the best the enemy of the good."); *cf. Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)("[F]ingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions . . . ."); *but see Patterson,* 445 Mass. at 655, 840 N.E.2d at 33 (holding that, although fingerprint examination is generally reliable, "the Commonwealth has not yet established that the application of [a particular] method . . . is generally accepted by the fingerprint examiner community or that a review of the other *Daubert* factors favors admission of evidence based on such an application").

¶ 37 Even assuming, for purposes of argument, that the motions court abused its discretion when it denied defendant's request to conduct a *Shreck* hearing before the fingerprint examiner testified at the sentencing hearing, we conclude with fair assurance, based on the foregoing reasons and in light of the entire record, that any error did not substantially influence the sentencing decision or impair the fairness of the sentencing hearing. *See Stewart,* 55 P.3d at 124.

### IV. The Trial Court Properly Applied the Preponderance of the Evidence Standard During Sentencing

¶ 38 The statute in question here upgraded defendant's crime from a class 6 felony to a class 4 felony "if the violation [was] committed subsequent to any prior conviction under subparagraph (I), (II), or (III) of paragraph (a) of subsection (2) of this section or under this subsection (2.3)." Ch. 424, sec. 3, § 18–18–405(2.3)(a), 2003 Colo. Sess. Laws 2682. The statute did not set forth a burden of proof. (Although the General Assembly has since repealed this provision, it was in effect at the time defendant committed his crime. *See* Ch. 259, sec. 3, 2010 Colo. Sess. Laws 1164 (repealing § 18–18–405(2.3)(a) effective Aug. 11, 2010.)

¶ 39 Defendant contends that the trial court used the wrong burden of proof—a preponderance of the evidence—when it found that he had been convicted of the 1997 drug-related felony. Instead, he argues, the proper burden of proof is beyond a reasonable doubt. As a result of the use of the wrong burden of proof, his argument proceeds, he was denied his right to due process of law. We disagree.

### A. Standard of Review

¶ 40 We review a defendant's constitutional challenge to a sentencing determination de novo. *Lopez v. People,* 113 P.3d 713, 720 (Colo.2005) (citing *People v. Matheny,* 46 P.3d 453, 462 (Colo.2002)).

### B. Discussion

¶ 41 The United States Supreme Court has held that the "fact of a prior conviction" is an exception to the general rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *accord Blakely v. Washington*, 542 U.S. 296, 301, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *Almendarez–Torres v. United States*, 523 U.S. 224, 230, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

¶ 42 Applying this authority, our supreme court explained the reason for the exception to the general rule:

> Prior conviction facts are [exempt from the general rule] in large part because these facts have been determined by a jury beyond a reasonable doubt or admitted by the defendant in a knowing and voluntary plea agreement. Thus, as long as the prior proceedings were not constitutionally flawed, the defendant's Sixth Amendment rights were adequately protected in the prior conviction proceeding.

*Lopez*, 113 P.3d at 730; *see also People v. Fiske*, 194 P.3d 495, 496 (Colo.App.2008) ("A prior conviction, even if the conviction is for a misdemeanor, is a *Blakely*-exempt fact.") (citing *People v. Huber*, 139 P.3d 628, 632–33 (Colo.2006)).

¶ 43 Since *Apprendi* and *Blakely* were decided, one division of our court has expressly held that, when a sentencing statute does not establish a burden of proof, "the prosecution need only prove the existence of prior conviction facts by a preponderance of the evidence." *People v. Schreiber*, 226 P.3d 1221, 1224 (Colo.App.2009). Cases that were decided before *Apprendi* and *Blakely* reached the same conclusion. *People v. Lacey*, 723 P.2d 111, 114 (Colo.1986); *People v. Whitley*, 998 P.2d 31, 34 (Colo.App.1999).

¶ 44 Defendant argues that, because the enhancement of his conviction from a class 6 felony to a class 4 felony exposes him to significantly harsher penalties, we should not follow these cases. We are not persuaded for the following reasons.

¶ 45 We reject defendant's argument that the sentence enhancer here is akin (1) to a finding that he was a habitual criminal, which requires the prosecution to prove, beyond a reasonable doubt, that the defendant has been previously convicted of a designated number of felonies, *see* § 18–1.3–803(4)(b), C.R.S.2012; and (2) to a finding that a defendant committed a violent crime, which requires that (a) crime of violence counts be pled as part of the charging document, *see*§ 18–1.3–406(3), C.R.S. 2012; (b) a jury make findings concerning such counts, *see* § 18–1.3–406(4), C.R.S. 2012; and (c) the prosecution prove such counts beyond a reasonable doubt, *People v. Russo*, 713 P.2d 356, 364 (Colo.1986).

¶ 46 Defendant submits that, because the habitual criminal statute, like the sentence enhancer here, can increase a prospective sentence by four times, *see* § 18–1.3–801(2), C.R.S. 2012, the proper burden of proof for the sentence enhancer in this case should be beyond a reasonable doubt. We reject defendant's argument that language of the habitual criminal and mandatory sentence for crime of violence statutes required the trial court to impose that burden of proof in this case.

¶ 47 The habitual criminal statute expressly states that the burden of proving prior convictions is beyond a reasonable doubt. There is no such statutory statement concerning the sentence enhancer here. Thus, the statute establishing the sentence enhancer here is like the one in *Schreiber*, which "does not establish the burden of proof." *Schreiber*, 226 P.3d at 1223–24.

¶ 48 Because crime of violence counts must be pled as counts in the charging document and submitted to the jury, our supreme court held that the "only plausible interpretation" of the mandatory sentence for violent crime statute is that the legislature intended that the violent crime sentence enhancer be proved "by the same standard of proof applicable to the trial of the substantive crime." *Russo*, 713 P.2d at 364.

¶ 49 Section 18–18–405(2.3)(a) was a sentence enhancer, not a substantive offense, or an element of a substantive offense. *See Schreiber*, 226 P.3d at 1223 (a statute is a sentence enhancer, and not a substantive offense, when "(1) a defendant may be convicted of the underlying offense without any proof regarding the sentence enhancer; and (2) the sentence enhancement provision only increases the potential punishment"). This

statute did not contain pleading requirements similar to those found in the mandatory sentence for violent crime statute, and it did not require that the sentence enhancer be submitted to the jury. In this regard, section 18–18–405(2.3)(a) was similar to the statute in *Schreiber.* Thus, there is no language, as there was in *Russo,* that compels us to conclude that the "only plausible interpretation" of the statute here is that the legislature intended that prior convictions be proved beyond a reasonable doubt.

¶ 50 Further, the mandatory sentence for violent crime statute does not involve a prior determination of guilt. Rather, it involves conduct that has not previously been submitted to a jury or resolved by way of a guilty plea. The sentence enhancer here, in contrast, relies on "facts [that] have been determined by a jury beyond a reasonable doubt or admitted by the defendant in a knowing and voluntary plea agreement." *Lopez,* 113 P.3d at 730. Thus, defendant's "rights were adequately protected in the prior conviction proceeding." *Id.*

¶ 51 Last, defendant points to *Almendarez–Torres,* 523 U.S. at 248, 118 S.Ct. 1219, where the United States Supreme Court stated that it would not take a position "on whether some heightened standard of proof might apply to sentencing determinations that bear significantly on the severity of the sentence." The Supreme Court has not taken any position on this issue in the fifteen years since *Almendarez–Torres* was decided, and our research has not discovered any Colorado appellate opinion that has done so. Therefore, there is no precedential foundation for defendant's argument that the proper burden of proof in these circumstances should be beyond a reasonable doubt because the sentence for a class 4 felony is harsher or more severe than a sentence for a class 6 felony.

¶ 52 Even assuming, for the purposes of argument, that this contention is relevant to our analysis, we decline defendant's invitation to discard the reasoning in cases such as *Lacey, Whitley,* and *Schreiber.* He asserts that the difference between the sentence for a class 6 felony and the sentence for a class 4 felony is harsher than differences between the sentences at issue in those cases. We

conclude that this purported distinction is one without a meaningful difference.

¶ 53 In this case, the presumptive sentencing range for a class 6 felony is from one year to eighteen months in prison. *See* § 18–1.3–401(1)(a)(V)(A), C.R.S. 2012. The presumptive range for a class 4 felony is from two to six years in prison. *Id.* Therefore, proportionately, the maximum presumptive range sentence for a class 4 felony is four times greater (six years) than the maximum presumptive range sentence for a class 6 felony (eighteen months), although, in absolute terms, the difference is four and one-half years.

¶ 54 In *Lacey,* the trial court found that the defendant was on probation when he committed the crime that was then before the court. The pertinent sentence enhancer "operated to enhance the minimum sentence for the class [4] felony from two years to beyond four years [and up to eight years]." *Lacey,* 723 P.2d at 112 n. 3, 113. Thus, once the trial court found the facts to establish the sentence enhancer, Lacey faced a proportionate difference of a sentence that was twice as long as the presumptive sentence, and an absolute difference of up to four additional years in prison.

¶ 55 In *Whitley,* a case that is factually and legally similar to this one, the defendant was convicted of the class 4 felony of selling cocaine to an undercover officer, but his sentence was enhanced to a class 2 felony because he was a prior offender, as that term was defined by statute. *Whitley,* 998 P.2d at 33. The presumptive range sentence for a class 4 felony is, as noted above, from two to six years, and the aggravated range is from six to twelve years; the presumptive range for a class 2 felony is from eight to twenty-four years, and the aggravated range is from twenty-four to forty-eight years. § 18–1.3–401(1)(a)(V)(A), (6), C.R.S. 2012 (formerly codified at § 18–1–105(1)(a)(V)(A), (6)). Thus, the sentence enhancer in *Whitley* increased the possible presumptive range and aggravated range sentences proportionately by four times, but, in absolute terms, it increased the possible presumptive range sentence by eighteen years, and the possible

aggravated range sentence by thirty-six years.

¶ 56 And, in *Schreiber,* the sentence enhancer transformed the crime from a class 1 misdemeanor, with a sentencing range of six to eighteen months in a county jail, to a class 6 felony, with a presumptive sentencing range of one year to eighteen months in prison. *See* §§ 18–1.3–401(1)(a)(V)(A),, 18–1.3–501(1)(a), C.R.S. 2012; *Schreiber,* 226 P.3d at 1223.

¶ 57 (We note that this case does not present the same issue that prompted the partial dissent in *Schreiber. See* 226 P.3d at 1225–27 (Bernard, J., concurring in part and dissenting in part). The focus of the dissent was the relationship of the burden of proof to the "change of phase" from a misdemeanor to a felony. And the dissenting judge made clear that "generally . . . evidence concerning prior convictions need not be . . . proved beyond a reasonable doubt before [it] may be used to increase the length of an offender's sentence." *Id.* at 1225 (citation omitted).)

¶ 58 Based on the foregoing analysis, we conclude that the trial court used the proper evidentiary standard—a preponderance of the evidence—when it found that defendant had been convicted of the 1997 drug-related felony. We further conclude, therefore, that defendant's due process rights were not abridged.

¶ 59 The judgment and sentence are affirmed.

JUDGE J. JONES and JUDGE RICHMAN concur.