23CA0749 Peo v Gonzalez-Victoria 06-04-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0749
Weld County District Court No. 20CR1743
Honorable Vincente G. Vigil, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jose Roberto Gonzalez-Victoria,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE DUNN
J. Jones and Fox, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Mallika L. Magner, Alternate Defense Counsel, Crested Butte, Colorado, for
Defendant-Appellant

¶ 1     A jury convicted defendant, Jose Roberto Gonzalez-Victoria, of nineteen counts of drug-related crimes.  Gonzalez-Victoria appeals his judgment of conviction, arguing that the district court reversibly erred by (1) failing to merge twelve conspiracy convictions into a single conviction; (2) allowing the prosecutor to commit misconduct throughout the trial; (3) admitting improper and prejudicial evidence; and (4) admitting improper expert witness testimony.  Gonzalez-Victoria also argues that the cumulative effect of these errors requires reversal.  We agree with Gonzalez-Victoria that some of the conspiracy convictions must merge, reverse that portion of the judgment, but otherwise affirm.

## I.    Background

¶ 2     Near the end of 2019, the Weld County Drug Task Force received information leading them to believe that Gonzalez-Victoria was involved in the purchase and sale of drugs.  Over the next few months, Valentin Oliveros — an undercover investigator with the Task Force — purchased fentanyl and cocaine from Gonzalez-Victoria on four occasions.  Officers then obtained a warrant to tap Gonzalez-Victoria's phone.

¶ 3     Between May and August 2020, officers monitored Gonzalez-Victoria's phone conversations and surveilled him.  The officers heard and observed Gonzalez-Victoria planning and executing twelve transactions to buy or sell various drugs.  In late August, after monitoring communications suggesting that drugs would be transported from Arizona to Colorado, officers stopped a truck and found eighty-eight pounds of methamphetamine.  A few days later, officers arrested Gonzalez-Victoria.

¶ 4     The prosecution charged Gonzalez-Victoria with two counts of money laundering, four counts of fentanyl distribution (including a special offender count for distributing near a school), one count of cocaine distribution, and twelve counts of conspiracy to distribute a controlled substance.

¶ 5     Gonzalez-Victoria didn't testify at trial.  His counsel admitted Gonzalez-Victoria's guilt on the four distribution counts but disputed the conspiracy charges primarily on the theory that the quantity of drugs involved was unclear.  The jury found Gonzalez-Victoria guilty as charged.  The district court sentenced Gonzalez-Victoria to an aggregate 244-year prison term.

## II.     Merger

¶ 6     Gonzalez-Victoria contends that the People proved a single conspiracy to distribute drugs and, therefore, his multiple conspiracy convictions violate his right to be free from double jeopardy.  Thus, he argues that the district court erred by failing to merge all the conspiracy convictions into a single conspiracy conviction.  While the evidence supports more than one conspiracy conviction, we agree that some of Gonzalez-Victoria's conspiracy convictions must merge.

### A.     Additional Background

¶ 7     During the trial, the prosecution argued that Gonzalez-Victoria was the "[m]ain source and distributor" of the "Gonzalez-Victoria drug trafficking organization."  As part of its presentation, the prosecution introduced an exhibit showing pictures of ten individuals, including Gonzalez-Victoria (Exhibit 1).  The exhibit identified the names of the individuals and their roles in the organization and showed arrows going to and from Gonzalez-Victoria (who was roughly in the center).  Some of the individuals' phone numbers and addresses were also identified.

¶ 8     The prosecution also introduced evidence for each conspiracy count consisting of (1) the wiretap conversations; (2) expert witness testimony explaining the coded language used in the conversations between Gonzalez-Victoria and various co-conspirators to arrange drug transactions; and (3) testimony from officers who followed Gonzalez-Victoria and witnessed him attend meetings that corresponded with the transactions arranged in the conversations.

¶ 9     Six of the charges involved wholesale transactions where Gonzalez-Victoria bought drugs from three main sources in bulk. The other six charges related to distribution transactions where Gonzalez-Victoria sold smaller quantities of drugs to different individuals.

¶ 10    After trial, Gonzalez-Victoria asked the court to merge the twelve conspiracy convictions into one conviction, arguing that "the evidence adduced at trial proved the existence of a single conspiracy between [him] and all other named or unknown conspirators to engage in the sale and distribution of controlled substances."

¶ 11    The court denied the request, finding that the transactions were not part of the same criminal episode because they occurred in "separate and distinct states, involv[ed] several different co-

conspirators[, and] . . . involv[ed] several different types of controlled substances, in different quantities in exchange for differing amounts of values."

B.     Legal Principles and Standard of Review

¶ 12     An individual is guilty of a conspiracy to commit a crime if he "agrees with another person or persons that they . . . will engage in conduct which constitutes a crime or an attempt to commit a crime" and he has "the intent to promote or facilitate its commission." § 18-2-201(1), C.R.S. 2025. "If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are part of a single criminal episode." § 18-2-201(4). Thus, "a single conspiratorial agreement may not be divided into multiple charges." *People v. Davis*, 2017 COA 40M, ¶ 17.

¶ 13     To determine whether the evidence established a single conspiracy to commit multiple crimes versus multiple discrete conspiracies, we consider various factors. That the alleged acts occurred during the same period, the type of overt act is the same, the unlawful objective of the conspiracy is the same, the modus operandi is the same, and the same evidence would be relevant to the charges tends to show a single conspiracy. *Pinelli v. Dist. Ct.*,

5

595 P.2d 225, 227 (Colo. 1979); *accord Davis*, ¶ 18. By contrast, evidence that a defendant conspired with different parties, in different counties, and in different agreements and committed separate overt acts indicates multiple, distinct criminal episodes. *Davis*, ¶ 18.

¶ 14 Because the double jeopardy clause protects criminal defendants from multiple punishments for a single crime, *see People v. Arzabala*, 2012 COA 99, ¶¶ 20-21, if the evidence supports only a single conspiracy, the remaining conspiracy convictions must merge into a single conviction, *see Whiteaker v. People*, 2024 CO 25, ¶ 24 ("[W]hen a defendant establishes that a [district] court entered multiplicitous punishments in violation of double jeopardy principles, merger is the remedy.").

¶ 15 We review double jeopardy claims de novo. *People v. Wambolt*, 2018 COA 88, ¶ 8. We likewise review de novo whether evidence shows a single agreement. *People v. Woodyard*, 2023 COA 78, ¶ 85.

C.    Hub and Spoke Theory

¶ 16 Although Gonzalez-Victoria generally asserts that the *Pinelli* factors favor merger, he also seems to suggest — with little explanation — that his conspiracy convictions must merge as a

6

single "wheel and hub" conspiracy. To the extent he develops this argument — and that's debatable — we disagree.

¶ 17    A wheel and hub conspiracy requires that "each conspirator knew or had reason to know of the existence and scope of the conspiracy and that each had reason to believe that his benefit depended upon the success of the entire venture." *People v. Serrano*, 804 P.2d 253, 254 (Colo. App. 1990). And Gonzalez-Victoria doesn't point us to any evidence in the record that all his co-conspirators were aware of each other or that "an overall plan with a common object" existed. *Id.* Nor could he, as several of the charges involved unknown individuals or isolated transactions without any connecting evidence. We therefore disagree that the conspiracy counts merge under the wheel and hub theory.

## D.    The Buying Convictions

¶ 18    Counts 4, 8, 10, 11, 12, and 18 involve wholesale transactions in which Gonzalez-Victoria bought drugs from three different sources. Without analyzing any of his convictions individually, or the evidence supporting them, Gonzalez-Victoria broadly asserts that his convictions "involve the same cast of characters" on Exhibit

1, and that all the overt acts were "ordering the same three drugs from the same sources and distributing to the same sources."

¶ 19    Because that broad assertion is neither helpful nor accurate, we turn to the evidence supporting the convictions on counts 4, 8, 10, 11, 12, and 18.  The counts all charged "Conspiracy – Controlled Substances" with specific offense dates between May and August 2020.

¶ 20    The evidence supporting count 4 established that on May 30-31 Gonzalez-Victoria coordinated the purchase of methamphetamine from an Arizona supplier.  Officers observed the supplier meet with Gonzalez-Victoria in Greeley.

¶ 21    In support of count 8, the prosecution presented evidence that on June 7 Gonzalez-Victoria arranged to buy a quarter of a kilogram of cocaine from a Denver source.  A driver then took Gonzalez-Victoria to Denver.  Officers followed Gonzalez-Victoria and observed him meet the supplier in a parking lot.

¶ 22    The evidence supporting count 10 showed that on July 7 Gonzalez-Victoria arranged to purchase methamphetamine from a Greeley associate.  And officers observed a courier delivering a box to Gonzalez-Victoria's home.

¶ 23     The prosecution presented evidence for count 11 that on August 2 Gonzalez-Victoria arranged to purchase 1,000 fentanyl pills from the Denver source.  They arranged to meet at a restaurant in Brighton.  Officers observed Gonzalez-Victoria, Greeley associates, and the Denver supplier meeting at the restaurant.

¶ 24     The evidence supporting count 12 showed that on August 28-30 Gonzalez-Victoria communicated with the Arizona source about buying fentanyl pills.  They discussed a courier coming to Denver.  The Arizona source also asked Gonzalez-Victoria about taking a load of methamphetamine.  Officers stopped the courier in Colorado and found eighty-eight pounds of methamphetamine hidden in the truck.

¶ 25     And the evidence for count 18 established that on July 26 Gonzalez-Victoria arranged to buy 500 fentanyl pills from the Denver supplier and meet at the same Brighton restaurant where they had engaged in the transaction charged in count 11.  Officers saw Gonzalez-Victoria, a Greeley associate, and the Denver supplier meeting at the restaurant.

¶ 26    Considering the *Pinelli* factors and the evidence presented, we conclude that Gonzalez-Victoria's convictions for counts 11 and 18 should merge.[1]  Those convictions involved purchases from the same drug supplier with the same unlawful objective to purchase fentanyl pills.  *See Davis*, ¶ 20 (finding "same unlawful objective" between actors "to distribute one type of drug supplied by one co-conspirator").  And the transactions were arranged by Gonzalez-Victoria in the same way and occurred days apart at the same Brighton location.  Highlighting the overlapping nature of the two transactions, the prosecutor described the two counts as "eerily similar" in closing argument.

¶ 27    For similar reasons, we conclude that Gonzalez-Victoria's convictions for counts 4 and 12 should merge.[2]  These convictions involve Gonzalez-Victoria agreeing to make two large purchases of methamphetamine from the same Arizona drug source within three months of each other.  *See id.* (determining two-month period to be "relatively short time frame").  The transactions shared the same

---

[1] Counts 11 and 18 are both level 2 drug felonies.  § 18-18-405(2)(b)(I)(A), C.R.S. 2025.

[2] Counts 4 and 12 are both level 1 drug felonies.  § 18-18-405(2)(a)(I)(A).

modus operandi of smuggling drugs from Arizona to Weld County and were arranged in the same way by the same co-conspirators. *See id.* at ¶ 26 (concluding that "ongoing phone calls and transactions with one person ordering methamphetamine in similar quantities" in one county over a few months was one criminal episode).

¶ 28    But the remaining buying convictions — counts 8 and 10 — are different.  Count 8 involved a large purchase of cocaine.  Though the Denver source supplied the cocaine, the exchange was in a location different from the others, and the evidence to prove this transaction did not overlap with the evidence regarding the purchase of fentanyl pills.  And count 10 involved an agreement to purchase methamphetamine from a Greeley source; thus, it involved an entirely different supplier than the other buying transactions.

¶ 29    We therefore conclude that the district court should have merged Gonzalez-Victoria's convictions for counts 11 and 18 into one conviction and his convictions for counts 4 and 12 into one conviction.  We thus remand the case to the district court for correction of the mittimus.

## E. The Selling Convictions

¶ 30     The remaining conspiracy convictions — counts 3, 5, 6, 7, 9, and 17 — involve Gonzalez-Victoria selling drugs to other individuals. Though he again broadly argues that all the conspiracy convictions should merge, even he concedes that counts 3, 9, and 17 involved the sale of drugs in small quantities to unknown people or individuals who didn't participate in any of the other transactions and are not identified on Exhibit 1. And he develops no argument explaining why these convictions should merge into any other conviction. We therefore consider the evidence supporting the convictions on counts 5, 6, and 7.

¶ 31     Doing that shows that each of these counts concerns a discrete criminal episode. For counts 5, 6, and 7, the prosecution presented evidence that, on different dates, Gonzalez-Victoria agreed to sell different quantities of drugs to different individuals, and the transactions were completed at different locations. *See Davis,* ¶ 18. Gonzalez-Victoria does not explain how the evidence supporting these counts "would be relevant" to each other (or any other count). *See id.*

12

¶ 32     Because counts 3, 5, 6, 7, 9, and 17 arose from multiple, discrete criminal episodes, the district court didn't err by declining to merge these convictions

### III.     Prosecutorial Misconduct

¶ 33     Gonzalez-Victoria next contends that the prosecutor committed pervasive misconduct throughout the trial.  We disagree.

### A.     Legal Principles and Standard of Review

¶ 34     When reviewing a claim of prosecutorial misconduct, we consider whether the prosecutor's conduct was improper and whether any impropriety requires reversal.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  "Whether a prosecutor's statements constitute misconduct is generally a matter left to the [district] court's discretion."  *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005).

¶ 35     We review preserved claims of prosecutorial misconduct for harmless error, reversing only if the error substantially influenced the verdict or affected the fairness of the trial.  *People v. Walker*, 2022 COA 15, ¶ 28.

¶ 36     For unpreserved claims, we review for plain error.  *See People v. Licona-Ortega*, 2022 COA 27, ¶ 88.  Only misconduct that is

13

"flagrantly, glaringly, or tremendously improper" warrants reversal under the plain error standard. *Domingo-Gomez*, 125 P.3d at 1053 (citation omitted); *see also People v. Smalley*, 2015 COA 140, ¶ 37 ("Prosecutorial misconduct in closing argument rarely constitutes plain error.").

## B. Voir Dire: Bolstering

¶ 37 At the beginning of voir dire, the court read the charges against Gonzalez-Victoria. It then instructed the venire that the charges "are not evidence of anything," Gonzalez-Victoria is presumed innocent, and the prosecution has the burden to prove the charges beyond a reasonable doubt.

¶ 38 During the second day of voir dire, after several prospective jurors were excused, the attorneys questioned new venire members. During that questioning, the prosecutor asked one prospective juror the following:

> Is there anything about this case that makes you think that you couldn't be fair and impartial as it pertains to the subject matter, number of counts, and those things? And let me start with do you recall the discussion yesterday that I've essentially brought these charges, they're accusations only, and therefore, I have a long list of things to back up?

¶ 39    After the prospective juror responded, the prosecutor continued, "Ultimately, do you believe you can decide whether I've met my burden of proof based on the evidence that would be presented at trial?"

¶ 40    With another prospective juror, the prosecutor similarly stated, "I make the charges and I intend to back them up," and "your role would be to decide based on the evidence that I provide whether or not I've done that. Do you feel comfortable with that?"

¶ 41    The prosecutor had the following similar colloquy with a third prospective juror:

> Prosecutor: Do you understand I brought these charges?
>
> Prospective Juror: Yes.
>
> Prosecutor: I need to back them up?
>
> Prospective Juror: Yeah.
>
> Prosecutor: And you have to wait until the evidence, right? Any other concerns whatsoever?

¶ 42    Though defense counsel didn't object to these specific comments, Gonzalez-Victoria now argues that they were improper "bolstering" and vouched "for the strength of the case." But none of these comments goes to the credibility of any witness or the

15

prosecutor's belief in the strength of the case. Read in context, they are all proper comments on the fact that the charges are not evidence, and that the prosecution has the burden to present evidence to support the charges.

¶ 43 Gonzalez-Victoria next argues that after one of the references to backing up the charges, the prosecutor committed misconduct by remarking, over his counsel's objection, "And I would provide you evidence . . . I want to get rid of this secret . . . I wouldn't be here if I didn't believe that. We have standards for that, right?" Gonzalez-Victoria specifically argues that this comment "impermissibly let the jury know that [the prosecutor] believed in the strength of the case, and that the case had met the 'standards' for a successful prosecution."

¶ 44 While it's unclear exactly what the prosecutor meant, we can't say that it was an improper comment on screening procedures or an expression of personal opinion. Rather, in context, the statement appears to have conveyed that although the prosecution couldn't present evidence in voir dire (which is true), it would present evidence to meet its burden at trial. Though the phrasing

16

was awkward and not ideal, voir dire is not perfectly scripted. We thus don't agree that the court abused its discretion by allowing it.

¶ 45 The same is true for the prosecutor's comment to a juror that "I can't present evidence at this point, I can't tell you what evidence I would present at this point. So again, this hypothetical is pretty tough." Again, this was an accurate statement. After all, the purpose of voir dire is to determine whether any jurors possess beliefs that would prevent the defendant from receiving a fair trial. *See People v. Wilson*, 2013 COA 75, ¶ 12. It is not to present evidence to support the charged crimes.

¶ 46 Thus, the district court didn't err by allowing these comments during voir dire.

## C. Voir Dire: Picture

¶ 47 During voir dire, defense counsel objected to a couple of demonstrative pictures that were apparently displayed at some point — one of which showed a stock image of children running a lemonade stand with the word "DRUGS" on a sign above it.[3]

---

[3] Though Gonzalez-Victoria asserts that this image was also shown during opening statement, he does not direct us to any portion of the record supporting that claim, and we see no indication that the picture was shown during opening statement.

17

Defense counsel objected because the demonstratives were not in the record. As part of that objection, defense counsel commented on the lemonade stand picture, stating that it wasn't "particularly appropriate to be interjecting children into this case because there are none."

¶ 48    The prosecution responded that it planned to use the pictures to help it gauge the venire's response to the "fact that these are undercover operations" and "not happening out in the public."

¶ 49    The district court ordered the prosecution to include the pictures in the record but overruled any objection to the manner of questioning. And as to the picture with the lemonade stand, the court commented, "I don't think anybody would believe that to be an actual depiction of children running a drug stand."

¶ 50    Gonzalez-Victoria now argues that it was improper to display the picture because it "had no connection to anything adduced at trial" and implied that the drugs he sold went to children.

¶ 51    But the record doesn't say whether the prosecution continued to display the picture. All we know is that the picture wasn't introduced into evidence, and Gonzalez-Victoria admits that "the prosecutor here did not comment on the photograph[]." And even

assuming the prosecution displayed it for at least some portion of the voir dire, Gonzalez-Victoria doesn't elaborate on how the picture — which was not brought to the venire's attention — could have possibly influenced the jury or affected the fairness of the trial.

¶ 52 Under these circumstances, we can't conclude that the court abused its discretion by allowing the prosecution to display the picture.

### D. Closing Argument: Facts Not in Evidence

¶ 53 We also reject Gonzalez-Victoria's claim that the prosecutor committed misconduct by referring to "facts not in evidence" when he argued that "if we had panned out" of a picture of Gonzalez-Victoria walking to the drug transaction in count 16 (the special offender count for selling drugs within 1,000 feet of a school), "we'd see kids playing hopscotch and dodgeball."

¶ 54 It is undisputed that Gonzalez-Victoria sold drugs to Oliveros within 1,000 feet of a school in the middle of the week during school hours — indeed his attorney admitted that at trial. And while the prosecutor may have overstated what the picture might have shown had it been enlarged, that children were playing around the school during the transaction is a reasonable inference from the admitted

19

evidence. *See People v. Vialpando*, 2022 CO 28, ¶ 23 (stating that a prosecutor may draw reasonable inferences from the evidence).

E. Closing Argument: Inflaming Passions and Denigrating the Defense

¶ 55 Gonzalez-Victoria asserts that the prosecutor improperly inflamed the passions of the jury in its closing argument by, among other things, referring to drugs as "poison" and describing the amount of drugs and money in the case as "sickening" and "disgusting." And he asserts that the prosecutor denigrated the defense and Gonzalez-Victoria by commenting on the evidence that Gonzalez-Victoria was a drug dealer and had a predisposition to selling drugs.

¶ 56 But beyond simply identifying the challenged comments, Gonzalez-Victoria doesn't develop this argument or explain how any of the comments were obviously and substantially improper. We therefore don't review this contention. *See People v. Relaford*, 2016 COA 99, ¶ 70 n.2.

F. Cartel Evidence

¶ 57 Gonzalez-Victoria next claims that the prosecutor committed misconduct by including "a reference to the Sinaloa cartel" in

20

Exhibit 1, which he says implied that he "[w]as [i]nvolved in the Sinaloa [c]artel."[4]  He also argues that this evidence was inadmissible under CRE 402 and 403.

¶ 58     Gonzalez-Victoria admits that the prosecution "never introduced evidence that connected [him] or any of his co[-]conspirators to the Sinaloa cartel."  Even so, he says a portion of Exhibit 1, shown below, implied that he is part of the Sinaloa cartel.



52-6674572957
Roberto's Son
Possible ID: Miguel Humberto Victoria Reyes
▲ Sinaloa
⊷ Cocaine Source
○ Role: Distributing thousands of fentanyl pills

The Portion of Exhibit 1 Displaying the "Sinaloa" Reference

¶ 59     Gonzalez-Victoria argues that the identification of a Mexican phone number and the single reference to Sinaloa — which was never commented on at trial — constitute improper evidence linking him to the Sinaloa cartel.  We are unpersuaded, however, that a

---

[4] The district court denied defense counsel's request to strike the portion of Exhibit 1 that referenced a Mexican phone number and the state of Sinaloa.

21

Mexican phone number and reference to the Mexican state of Sinaloa, untethered to any testimony about Sinaloa or the cartel, constitutes improper evidence that Gonzalez-Victoria had ties to a cartel.[5]

¶ 60    For all these reasons, we reject Gonzalez-Victoria's claims that the prosecutor engaged in pervasive misconduct.

## IV.    Expert Witness Testimony

¶ 61    Gonzalez-Victoria contends that the district court erred by admitting portions of Oliveros' expert testimony. We are unconvinced that the court plainly erred.

### A.    Additional Background

¶ 62    On the first day of trial, Oliveros — the Task Force's undercover investigator — testified about his experience and specialized training in narcotics investigations. Over Gonzalez-Victoria's counsel's objection, the court qualified Oliveros as an expert in the Spanish language and "narcotics and culture, including prices, amounts for personal use and distribution, as well as terminology." Oliveros testified multiple times during the trial.

---

[5] The only reference to the Sinaloa cartel during trial was in defense counsel's closing argument.

He first testified as a fact witness and described his four drug purchases from Gonzalez-Victoria. Oliveros then testified that he had listened to "thousands" of wiretap calls between Gonzalez-Victoria and others and opined about the potential meaning of various coded conversations. Gonzalez-Victoria did not object to this testimony.

¶ 63 For each of the twelve conspiracy charges, the prosecution also asked Oliveros whether, in his expert opinion, he believed that the evidence introduced proved some of the elements of the conspiracy charges. On each count, Oliveros opined that he believed that Gonzalez-Victoria entered into an agreement to commit the conspiracy and took overt acts to complete it. Gonzalez-Victoria's counsel also did not object to this testimony.

¶ 64 Gonzalez-Victoria now complains that the district court plainly erred by allowing Oliveros to testify in a "dual capacity," improperly summarize factual evidence, opine beyond the scope of his expert qualification, and usurp the jury's function.

B. Legal Principles and Standard of Review

¶ 65 A witness may be qualified as an expert if he has specialized knowledge that will "assist the trier of fact to understand the

23

evidence or to determine a fact in issue." CRE 702. Expert testimony must be both reliable and relevant, meaning it "would be useful to the jury." *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). And while an expert may opine on an ultimate issue of fact, CRE 704, an expert may not usurp the jury's function of weighing the evidence and determining witness credibility. *See People v. Baker*, 2021 CO 29, ¶ 34.

¶ 66    To determine whether opinion testimony is admissible under CRE 702 and CRE 704, we consider several factors, including whether (1) the testimony was clarified on cross-examination; (2) the expert expressed an opinion on the applicable law or legal standards and thereby usurped the court's function; (3) the court properly instructed the jury on the law and that it could accept or reject the expert's opinion; and (4) the expert opined that the defendant had committed the crime or that there was a particular likelihood that the defendant had done so. *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).

¶ 67    We review a district court's admission of expert testimony for an abuse of discretion. *Baker*, ¶ 29. A court abuses its discretion

24

when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.*

¶ 68 When — as is the case here — defense counsel does not object to any of the challenged testimony at trial, we review for plain error. *Id.* at ¶ 36. An error is plain, and therefore requires reversal, if it was obvious and "so undermined the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (citation omitted).

## C. Dual Capacity

¶ 69 Oliveros testified as a fact witness about his drug purchases from Gonzalez-Victoria and offered expert opinion testimony about Gonzalez-Victoria's conversations arranging drug transactions with others.

¶ 70 Insofar as Gonzalez-Victoria suggests that the court plainly erred by allowing Oliveros to testify as a fact and expert witness, because Colorado doesn't categorically ban such "dual capacity" testimony, *People v. Fortson*, 2018 COA 46M, ¶ 97, any error could not have been plain. *See People v. Crabtree*, 2024 CO 40M, ¶ 42 ("[T]o be deemed plain, an error must contravene a clear statutory

command, a well-settled legal principle, or established Colorado case law.").

### D. Factual Summary

¶ 71 We next reject Gonzalez-Victoria's claim that the district court plainly erred by allowing Oliveros to improperly "interpret and summarize factual evidence derived from the investigation."

¶ 72 Though Gonzalez-Victoria doesn't point to any particular testimony that he claims was an improper factual summary, Oliveros was qualified in narcotics distribution and terminology. Because slang used in narcotics transactions is not generally known to people who don't participate in narcotics distribution, his testimony assisted the jury in understanding the coded conversations. *See People v. Bryant*, 2018 COA 53, ¶ 73 (noting that defining drug related slang is expert testimony). And to the extent Oliveros also interpreted and explained the coded conversations based on his experience and training, this too aided the jury in understanding the evidence and thus was permissible. *See People v. Davis*, 2012 COA 56, ¶ 56 (concluding court properly admitted a detective's testimony interpreting coded gang messages because it "is an appropriate area for expert testimony by a police

officer who has intensively investigated a gang and its methods of communication").

E.     Scope of Qualifications

¶ 73     Gonzalez-Victoria next complains that Oliveros "gave opinions that far exceeded the scope of his expert qualification." The only thing he identifies in this regard, however, is "[d]efendant's state of mind." But he points to no testimony that he claims is an opinion about his state of mind.

¶ 74     And to the extent Gonzalez-Victoria generally complains that Oliveros testified about the types and quantities of drugs discussed on the wiretap calls, the course of the investigation, and the people involved in the various drug transactions that are reflected in Exhibit 1, that testimony was tethered to the investigation and was based on his experience and expertise in narcotics investigations. It was therefore well within the scope of his qualifications. *See People v. Munoz-Casteneda*, 2012 COA 109, ¶ 28 (describing evidence about the defendant's involvement in drug trafficking organization as required for conspiracy charge).

## F.  Usurping the Jury's Function

¶ 75    Gonzalez-Victoria also argues that Oliveros improperly testified that Gonzalez-Victoria "was guilty of each of the twelve conspiracy counts" because he opined that Gonzalez-Victoria entered into conspiratorial agreements and took overt acts toward completing them.  While Oliveros didn't testify to Gonzalez-Victoria's guilt, it's true that — at the prosector's prompting — Oliveros did opine that Gonzalez-Victoria entered into conspiratorial agreements and took overt acts toward completing them.  We agree that those portions of Oliveros' testimony were improper expressions "of the applicable law or legal standards."  *Rector*, 248 P.3d at 1203.  But even so, we can't conclude the court plainly erred.  That's so for two reasons.  First, the other *Rector* factors support the admissibility of the testimony.  After all, defense counsel cross-examined Oliveros at length, making it clear that Oliveros' testimony was his "opinion."  And the court properly instructed the jury on the law and that it could accept or reject an expert's opinion.  *Id.*  Finally, Oliveros never testified that Gonzalez-Victoria was guilty of conspiracy to distribute controlled substances.  *Id.*

¶ 76 Second, Gonzalez-Victoria bears the burden to show plain error. *See Walker*, ¶ 36. But Gonzalez-Victoria does not assert that the admission of the testimony satisfies the plain error test, much less explain how it does so.[6] Indeed, given that Oliveros testified about the conversations establishing each transaction and other officers corroborated the corresponding meetings, Gonzalez-Victoria has not demonstrated substantial prejudice from Oliveros' response to the prosecutor's questions.

## V. Cumulative Error

¶ 77 Gonzalez-Victoria asserts that, collectively, the district court's errors violated his right to a fair trial, entitling him to a new one. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24. But cumulative error requires multiple errors resulting in cumulative prejudice. *Id.* at ¶ 25. And even assuming the district court should have sua sponte struck some of Oliveros' testimony and should have merged two convictions, these errors didn't substantially affect the fairness

---

[6] Though Gonzalez-Victoria recognizes that this contention is unpreserved, he argues that the error is not harmless. But that is the wrong standard of reversal.

29

of the trial proceedings and the integrity of the factfinding.  Thus,
reversal for cumulative error isn't warranted.

## VI.    Disposition

¶ 78    We reverse the portion of the judgment showing separate
convictions for counts 4 and 12 and counts 11 and 18, otherwise
affirm the judgment, and remand to the district court to (1) merge
the convictions on counts 11 and 18; (2) merge the convictions on
counts 4 and 12; (3) amend the mittimus to reflect the merger; and
(4) resentence Gonzalez-Victoria, if necessary.

JUDGE J. JONES and JUDGE FOX concur.