21CA0311 Peo v Shockey 05-28-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA0311
Arapahoe County District Court No. 17CR3039
Honorable Michael Spear, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jacob Alexander Shockey,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Yun, J. and Martinez*, J., concur

Prior Opinion Announced December 21, 2023, Reversed in 24SC117

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 28, 2026

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Mark Klekas, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

The original division in this case comprised Judge Richman, now retired, Judge
Rebecca Freyre, and Judge David Yun. For this opinion, the division has been

reconstituted with Judge Freyre, Judge Yun, and former Colorado Supreme Court Justice Alex J. Martinez.

¶ 1    This case returns to us on remand from the Colorado Supreme Court reinstating the judgment and directing us to address the remaining issues. Defendant, Jacob Alexander Shockey, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder. We affirm.

## I.    Background

¶ 2    The relevant facts are detailed in our original opinion, *People v. Shockey*, 2023 COA 121, ¶¶ 2-10 (*Shockey I*), *rev'd*, 2026 CO 10. In *Shockey I*, we vacated the judgment of conviction, concluding that the jury's finding that Shockey did not possess, use, or threaten to use a deadly weapon was inconsistent with its guilty verdict for second degree murder in the absence of a complicity instruction, thereby negating the identity element. We further held that the inconsistency constituted structural error. The supreme court reversed our decision and remanded the case to us. *People v. Shockey*, 2026 CO 10 (*Shockey II*). We now address the issues left unresolved in *Shockey I*.

¶ 3    Shockey challenges his conviction on several grounds and alleges that the trial court erroneously (1) violated his due process rights by permitting his conviction to stand absent a complicity

1

instruction; (2) allowed extraneous prejudicial information of complicity in voir dire to influence the verdict without considering information contained in juror affidavits; (3) allowed the prosecutor to discuss complicity in voir dire over the defense's objection; (4) failed to admonish the jury not to consider a complicity theory once it concluded insufficient evidence of complicity existed to warrant an instruction; (5) admitted prior misconduct evidence in violation of *Rojas v. People*, 2022 CO 8; and (6) ordered restitution based on insufficient evidence.

## II.      Complicity Related Arguments

¶ 4      Several of Shockey's contentions relate to complicity — a theory on which the jury was never instructed. We begin with his contention that the court erred by allowing the prosecution to voir dire on complicity over his objection. We then turn to his contention that the court should have *sua sponte* instructed the jury not to consider complicity in its deliberations after ruling that insufficient evidence supported a complicity instruction. Next, we address his contention that the court should have vacated his conviction based on juror affidavits indicating that the jury

2

convicted him on a complicity theory.[1]  Last, we address whether, in the absence of a complicity instruction, Shockey's conviction violates due process.

## A.  Additional Facts

¶ 5    The State charged Shockey with first degree murder and two crime of violence sentence enhancers.  At the preliminary hearing, the prosecution announced its intent to proceed on a complicity theory.  Before trial, the prosecution tendered its proposed jury instructions, which did not include a complicity instruction.

Before voir dire began, the court instructed the jury as follows:

> Now, in this matter there will be 14 jurors selected to hear this matter.  The jury basically considers all of the evidence that is presented, and then at the end of the trial will reach a verdict with the assistance of legal instructions that I will give towards the end of the trial.
>
> *During the course of jury selection, and even during the course of the trial itself, some mention may be made of the legal rules, but essentially our system in Colorado, at least, has developed so that the legal rules themselves are*

---

[1] Shockey also argued that the verdict was inconsistent with the special interrogatory, the precise issue rejected by our supreme court.  Therefore, we only address whether the court erred in failing to consider the juror affidavits.

*not really absolutely formalized or finalized*
*until all of the evidence has been completed.*

So . . . basically if you're selected as a juror.
Listening to the witness testimony, viewing
exhibits that are introduced, but [you will] also
be restricted from really discussing these
amongst yourself or with any other party and
you'll have to wait patiently until the end of the
trial for me to give you kind of a framework in
which to assess all of the evidence in this case.

(Emphasis added)

¶ 6 During voir dire, the prosecutor discussed complicity liability

and used a hypothetical to illustrate the concept, stating

Under Colorado law, someone can be guilty as
a complicitor and a principal. So I'm going to
give you a little bit of a scenario to maybe
explain it and then I want to talk with you
guys about what you think about complicitor.

So let's talk about a scenario of a robbery of a
bank. So you have the getaway driver, you
have the lookout and you have the guy that
goes in with the mask and the gun. So all
three of them decide, you know what, we're
going to rob this bank. So the driver drives the
lookout, himself, and the robber to the bank.
The lookout goes out and stands in front of the
bank to look for cops or anyone else. And then
you have the guy that goes in and robs the
bank and he's got a gun and a mask and
points a gun at a teller and gets the money
from the bank. Now, under Colorado law, all —

¶ 7    Defense counsel objected based on his understanding that a complicity instruction was not going to be submitted to the jury at the close of the evidence. The court overruled the objection and again instructed the jury:

> Well, just so the jury panel is aware, frankly, during jury questioning there's going to be mention made of perhaps certain concepts of law, some examples that have occurred up to this point, and while it might not ultimately be applicable to the case before us, really if this is something that the prosecution would like to pursue, I'll go ahead and let that continue because I think also the Court usually looks at it as an opportunity for jurors to kind of break the ice, so to speak, and provide information as well, perhaps on more pertinent issues.

¶ 8    The prosecutor then discussed complicity liability at length, using the robbery hypothetical to illustrate the concept. She explained that, under Colorado law, all three defendants in her scenario — the lookout, the getaway driver, and the person who actually committed the robbery — could be found equally guilty due to complicity liability. She then asked the jurors whether they would be comfortable holding all the hypothetical defendants "accountable" even if some did not directly participate in the robbery. Many jurors agreed that the "punishment" or "treatment"

5

should be the same for the lookout as for the person who robbed the bank. A few of the jurors likewise used the terms "complicity" with "accountability" interchangeably.

> [PROSECUTOR]: [U]nder Colorado law, all three could be guilty of aggravated robbery, even though we're talking about the lookout, we're talking about the getaway driver, even though they didn't go into the bank and actually rob the bank. What do you think about that?
>
> [PROSPECTIVE JUROR 1]: They're all still complicit.
>
> [PROSECUTOR]: And you're okay with that?
>
> [PROSPECTIVE JUROR 1]: Yeah, I think they all should receive the same treatment.

¶ 9 Addressing another juror, the prosecutor asked

> [PROSECUTOR]: Does it bother you that the person who didn't have the gun and who wasn't involved in the actual robbery itself inside the bank could be held accountable as the person who went in and robbed the bank?
>
> [PROSPECTIVE JUROR 2]: Yeah, because he knew the guy went in there with a gun. He's complicit in the fact that he's going to go along with whatever happens in the bank. I would think he would be guilty too.

¶ 10 Addressing two other jurors, the prosecutor asked

> [PROSECUTOR]: [B]ack to my scenario, we have the lookout person versus the person that

6

goes in and robs with the gun, should they both be held accountable?

[PROSPECTIVE JUROR 3]: Held accountable, yes, but maybe not to the same amount.

[PROSPECTIVE JUROR 4]: I think everyone should be held accountable to the same extent. They all know what they're getting into . . . . So yeah, if you know that other people's lives are going to be put in danger, you have the opportunity to back out and say no, I don't want to do that, that's your choice but you go ahead and go along with it. And so yes, you should still have the same punishment as anyone else.

¶ 11    Addressing two more jurors, she continued

[PROSECUTOR]: So you feel good about complicity when we're talking about all three players in my little scenario?

[PROSPECTIVE JUROR 5]: Yes.

[PROSECUTOR]: How about you, Mr. B[] . . . What do you think, complicity?

[PROSPECTIVE JUROR 6]: Well, I think there's — we touched upon it here that there might have been some levels of complicity or accountability depending on whether, you know, the event went off as planned . . . . If somebody goes off the rails, I think they're the one that has to be accountable for that. I mean, there is some accountability or complicity, whatever you want to call it, for all of them because if you set up the — all set up the scenario that caused this to happen, but if somebody actually went off the rails, like I

7

said, there's some additional accountability for that person.

¶ 12    During questioning, a few jurors expressed difficulty with the idea of holding all three defendants "equally accountable" for the robbery.  At this point, the defense renewed its objection and asked the court to read the elements of complicity contained in section 18-1-603, C.R.S. 2025.  The court overruled the objection, and the prosecutor continued.

> [PROSECUTOR]: Mr. M[], what do you think?
>
> [PROSPECTIVE JUROR 7]: Maybe I'm getting ahead of the curve here, but in terms of complicity, there's two aspects.  One, there's guilty [sic] and innocence and people are complicit as you described, then they're guilty. I can see a scenario where maybe the punishment might vary depending upon degree, but that's a whole other conversation. If people were — were involved in the planning and knew something was either going to happen or could happen, then guilty at that point.  I have no problem.
>
> [PROSECUTOR]: Anyone feel different?  Ms. S[], what do you think?
>
> [PROSPECTIVE JUROR 8]: You know, maybe like he said, the person who actually pulled the trigger may have a longer sentence or more harsher sentence, I can get that, but honestly, it doesn't really matter what we think, because if Colorado law has already determined what that is, then you have to rule by the law.  It

doesn't really matter whether you think, oh,
the guy was just the getaway driver, whatever
the law says is what — I mean, that's what I'm
getting from all of this.

¶ 13     The prosecutor also discussed witness credibility, returning to the topic of complicity as part of that discussion.  She posed questions such as, "How do you judge the credibility of somebody that was involved?" and "[L]et's talk about my aggravated robbery example.  You come in, you're here for the trial of the robber, but we bring in the lookout guy, how are you going to judge the credibility of somebody involved?"  The prosecution went on to ask, "Does it become harder when we're talking about someone who is involved in the crime in judging their credibility?", "[D]oes it make sense that sometimes someone who is involved knows better what was going on than anyone else?", and "Someone who is involved in judging their credibility, what do you think about that?"

¶ 14     During the defense's voir dire, counsel questioned jurors about the right to remain silent, credibility, the reasonable doubt standard, mental states, gang membership, and drug dealers.  Counsel also questioned jurors about complicity, providing the legal requirements for complicity under Colorado law.

¶ 15    Immediately before opening statements, the court instructed the impaneled jury that it must decide the case based on the legal instructions provided by the court at the end of trial and not based on legal concepts discussed during voir dire, stating:

> After the evidence is completed in this case, then I will present to you what are called instructions of law.  These will be in written form.  I am required to read it to you and then you'll all get a copy to take back to the jury room, so for your own personal review and for the jury's review as well.
>
> *Now, there has been a lot of comment on the law in this case, what might be or might not be applicable, and of course during the course of a trial, things may change a little bit.*  So what we tell you today about the law . . . actually could vary significantly from what you're informed of at the end of the trial itself.
>
> *So please keep in mind leeway has been granted for the parties to discuss the law in this case.  The fact is if their discussions vary from what I give you at the end of the trial, frankly if my discussions vary from what I gave you at the end of the trial, those discussions at the end of the case will control your deliberations in this matter.*

(Emphasis added.)

¶ 16    At trial, co-defendant Parus Mayfield testified that Shockey shot the victim.  Mayfield said he did not know Shockey had a gun

10

or intended to shoot the victim, believing instead that Shockey would simply beat up the victim as he had done weeks earlier to collect a drug debt. A police officer testified that Shockey told him that the victim owed Mayfield money for drugs and that Mayfield had shot the victim. According to Shockey, as they walked down the alley, he heard Mayfield say he was going to "lay [the victim] down" and believed Mayfield intended to shoot the victim. The police never recovered a gun.

¶ 17    The prosecution tendered a complicity instruction at the end of the evidence that the court rejected. The court found that insufficient evidence supported the instruction, explaining

> Frankly, there hasn't been a whole lot in terms of presentation of evidence that would support complicity in this particular matter. We've got essentially two people who knew each other and often associated with each other out there on Colfax, in the area and kind of hanging out that night as well, and then meeting up with the victim in this particular matter, and then proceeding into an alleyway, and at that particular time the victim was shot a number of times. And the real issue in the case is who actually did the shooting. But in order for complicity to be a valid, viable theory to present to the jury, there at least needs to be some aspect of the evidence presented that would indicate that this should be something appropriately considered by the jury. And as

11

noted, the jury instructions themselves do set forth in agreement with the prosecution's proposed instruction. The elements that another person committed the crime, the defendant with the desire or the purpose or design to aid, abet, advise, or encourage the other person in planning or committing that crime, aided, abetted, advised or encouraged the other person in planning or committing that crime. At this point there is no sort of indication — Mr. Mayfield, of course, was on the stand for a considerable period of time, and at no time indicated that there was this desire or purpose or design to aid, abet, advise, or encourage in planning the commission of the crime of either first-degree or second-degree murder. The fact is that from his testimony, if you believe it, he indicated that he thought the worst of what happened were they were going to beat up the victim in this case, but obviously, of course, when he was told to look out, he thought maybe there might be some kind of drug transaction going on as well, or perhaps Mr. Shockey was going to beat up the victim on his own so there would possibly be complicity for assaultive behavior, but this is a step beyond assault itself. Mr. Mayfield indicated that he was surprised when the shooting occurred and immediately ran off as soon as the first two shots were fired, and then he heard a third shot. So we got the three people walking into the alley, and we got Mr. Mayfield's story of what happened. The information presented through [the eyewitness] is a little bit problematic in terms of what might have occurred, but really, she did not provide any testimony that would support some sort of complicity instruction as well; that she

12

believed that the two people who took her friend into the alleyway and, ultimately, shot and killed him were in some fashion acting in other than concert in terms of bringing him into the alley himself. And I suppose in that particular situation there could be an argument made that clearly there wasn't complicity, but I would note that we just have a passing reference to [the eyewitness's] belief that the victim was being essentially forced to go into that alley, although the video itself does not — multiple videos did not necessarily support a certain conclusion of a combined effort on the part of the defendant and Mr. Mayfield to bring the victim into the alley to make sure he didn't go somewhere else. In many respects I think the evidence is very, very problematic about whether or not a complicity — some kind of complicit action occurred in this particular matter for anything other than perhaps a drug deal, or at worst, an assault situation such as Mr. Mayfield described it happening earlier when he and Mr. Shockey apparently beat up the victim at one point. So I'm finding that complicity is something that would completely confuse the issues before the jury; that really there hasn't been a lot of information presented that would support a complicity theory of prosecution in this case. I'm going to sustain the objections of the [d]efense and not give the jury instructions related to the prosecution theory of complicity . . . .

¶ 18     In the final instructions, the court instructed the jury:

It is my job to decide what rules of law apply to the case. While the attorneys may comment on some of these rules, you must follow the

13

instructions I give you. Even if you disagree with or do not understand the reasons for some of the rules of law, you must follow them. No single instruction describes all the law which must be applied: the instructions must be considered together as a whole.

During the trial, you received all of the evidence that you may properly consider in deciding the case. Your decision must be made by applying the rules of law that I give you to the evidence presented at trial.

¶ 19 In closing argument, the prosecution asserted that Shockey caused the victim's death as the shooter and never specifically used the word complicity. It did, however, reference the voir dire discussion on credibility, urging the jury to consider the points raised during "jury selection." Moreover, the prosecution harkened back to its robbery hypothetical when it asserted that Mayfield "knew more about what happened that night, what the defendant was going to do, than he was willing to admit," and told the jury, "You can believe that he was acting as a lookout . . . because he knew what was going to happen, what the defendant was going to do." The defense did not object to these statements.

¶ 20 The court instructed the jury on the lesser included offense of second degree murder as follows:

14

1. That [Shockey],

2. in the State of Colorado, at or about the date and place charged,

3. knowingly,

4. caused the death of [the victim].

¶ 21    The jury also received a crime of violence special interrogatory that read:

Did Jacob Shockey use, or possess and threaten the use of, a deadly weapon?

Jacob Shockey used, or possessed and threatened the use of, a deadly weapon only if:

1. he used, or possessed and threatened the use of, a deadly weapon,

2. during the commission of the crime or in the immediate flight therefrom.

The prosecution has the burden to prove each numbered condition beyond a reasonable doubt.

After considering all the evidence, if you decide the prosecution has met this burden, you should mark "Yes" in the appropriate place, and have the foreperson sign the designated line of this Special Interrogatory.

After considering all the evidence, if you decide the prosecution has failed to meet this burden, you should mark "No" in the appropriate place, and have the foreperson sign the designated line of the verdict form.

15

¶ 22    The jury acquitted Shockey of first degree murder, convicted him of second degree murder, and answered the special interrogatory "No."

¶ 23    Shockey filed a post-trial motion to vacate the verdict, arguing that the jury's answer to the interrogatory was both logically and legally inconsistent with its guilty verdict.  Later, he filed juror affidavits indicating that the jurors had convicted Shockey on a complicity theory.  At the hearing, defense counsel argued that because the jury found Shockey was not the shooter, it could have found him guilty of murder only under a complicity theory — a theory on which the trial court refused to instruct the jury.  He cited the affidavits as support for his argument.  The prosecutor countered that the court could not properly consider the juror affidavits.

¶ 24    The trial court denied the motion, reasoning that jurors "kind of operate with a theory of complicity in many situations in any event."  The court further noted that the use of a deadly weapon is not an element of second degree murder, meaning the verdict was not "logically or legally inconsistent."  The court did not address the juror affidavits.

16

## B. Complicity in Voir Dire

¶ 25    Shockey contends the prosecution committed misconduct by using voir dire to indoctrinate the jury concerning complicity. Considering the record as a whole, including the court's repeated instructions that legal concepts discussed by the attorneys may or may not apply at the end of the case, we discern no misconduct.

### 1. Standard of Review and Applicable Law

¶ 26    The scope of voir dire is within the discretion of the trial court. *People v. Saiz*, 660 P.2d 2, 4 (Colo. App. 1982). "The propriety of questions to potential jurors on voir dire is within the discretion of the trial court . . . ." *People v. Collins*, 730 P.2d 293, 300 (Colo. 1986). We review claims of prosecutorial misconduct under a two-step process. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* Second, we decide whether the misconduct warrants reversal under the applicable standard. *Id.*

¶ 27    We review preserved claims of prosecutorial misconduct for harmless error. *People v. Rhea*, 2014 COA 60, ¶ 42. We will reverse if there is a reasonable probability that the error contributed

17

to the defendant's conviction.  *People v. Monroe*, 2018 COA 110, ¶ 11, *aff'd*, 2020 CO 67.

¶ 28     "To receive a fair trial, the defendant must be tried by an impartial jury."  *People v. Wilson*, 2013 COA 75, ¶ 12.  The purpose of voir dire, therefore, is "to allow counsel 'to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent [the defendant] from receiving a fair trial.'"  *Id.*  (quoting *People v. Rodriguez*, 914 P.2d 230, 255 (Colo. 1996)).  Indeed, counsel may generally conduct questioning to determine a juror's "willingness 'to accept the basic principles of criminal law'" and to follow the court's instructions.  *Wilson*, ¶ 17 (citation omitted); *see also People v. Collins*, 730 P.2d 293, 300 (Colo. 1986) (trial court properly permitted defense counsel to ask a limited number of questions about general legal principles surrounding self-defense to determine whether any juror would "reject a concept of law which was unfamiliar to them").  But "[c]ounsel may not use voir dire for the purpose of instructing or educating the jury."  *People v. Shipman*, 747 P.2d 1, 3 (Colo. App. 1987).  Nor may counsel misstate the law, present factual matters known to be inadmissible, or instruct the jury on their theory of the case.  *People v. Carter*,

2015 COA 24M-2, ¶ 71.  However, absent bad faith, the prosecution's discussion of a concept that later ends up not being an issue at trial does not require reversal.  *See People v. Estes*, 2012 COA 41, ¶ 23 ("[D]uring opening statement, a prosecutor may refer to evidence that subsequently will be adduced at trial and draw inferences from that evidence."); *Cf., People v. Melanson*, 937 P.2d 826, 836 (Colo. App. 1996) (noting that remarks in opening statement that are later not supported by the trial evidence are reversible only "if there has been an affirmative showing of bad faith and manifest prejudice").

## 2.    Analysis

¶ 29    Viewing the prosecution's voir dire in light of the totality of the circumstances, we discern no misconduct for four reasons.  First, the court repeatedly instructed the jury — three times before opening statements — that the attorneys might discuss legal concepts, but the jury could only consider the law as the court instructed at the conclusion of all the evidence.  Additionally, the court reminded the jury at the end of all the evidence that while the attorneys may have commented on the rules of law, "[the jury] must follow the instructions [the court] give[s] you."  We presume the jury

understood and followed these instructions. *See People v. Abdulla,* 2020 COA 109M, ¶ 58 ("[W]e employ the presumption that the jury understands and applies the given instructions unless a contrary showing is made . . . .") Thus, we must presume that the prosecution's voir dire did not affect the outcome of the trial. The jury's response to the crime of violence interrogatory cannot affect our analysis. As our supreme court indicated, "the jury's answer to the special interrogatory does not conflict with an element of second degree murder." *Shockey II,* ¶ 33. It is relevant to sentencing only. *Id.* at ¶ 34.

¶ 30    Second, while the prosecution's proposed instructions tendered before trial did not include a complicity instruction, we discern no bad faith on its part. The prosecution had announced its intent to pursue a complicity theory at the preliminary hearing, so the defense knew this theory of liability was a possibility before trial. Moreover, the prosecution knew it would introduce Shockey's statement to the police in which Shockey admitted that he *knew* Mayfield intended to shoot the victim as they walked the victim into the alley — evidence that arguably supported a complicity

instruction. And the prosecution did offer a complicity instruction at the end of the trial, although the court rejected it.

¶ 31    Third, the court repeatedly overruled the defense's objections and exercised its discretion to allow the prosecutor to question the jury on complicity law. Given the court's ruling, the prosecution did not engage in misconduct by following that ruling. *See People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985); *see also State v. Nowels*, 941 N.W.2d 430, 437 (Minn. Ct. App. 2020) ("It is misconduct for a prosecutor to violate an order from the district court.").

¶ 32    Finally, the prosecutor never mentioned complicity in closing arguments or urged the jury to convict under that theory. Instead, she argued that Shockey was the shooter and that the jury should credit Mayfield's testimony on this key point, despite his participation in the crime.

¶ 33    Accordingly, we conclude that no misconduct occurred and thus, that reversal is not required.

### C.    Limiting Instruction

¶ 34    Shockey next contends that, after the trial court declined to give the prosecution's complicity instruction, it should have *sua*

21

*sponte* issued a limiting instruction informing the jury that it could not consider complicity in its deliberations. He concedes that this argument is unpreserved and subject to plain error review. And he agrees that a court's decision to give a supplemental instruction is reviewed for an abuse of discretion. *People v. Dinapoli*, 2015 COA 9, ¶ 9.

¶ 35　　Relying on a case from the Oklahoma intermediate appellate court, Shockey argues that a trial court has a duty to correct any jury confusion concerning a rule of law. *See Master v. State*, 702 P.2d 375, 381 (Okla. Crim. App. 1985). However, he identifies no actual evidence of jury confusion, other than the jury's answer to the special interrogatory, which we have explained we cannot consider. Instead, Shockey is left to speculate that confusion existed based on voir dire. Notably, the court rejected the prosecution's complicity instruction precisely out of concern that it would confuse the jury. Moreover, defense counsel never requested a limiting instruction, and Shockey cites no authority requiring one. Thus, any error was not "obvious" under the plain error standard. Accordingly, we discern no plain error.

## D.    Juror Affidavits

¶ 36    Shockey next contends that the trial court should have considered the juror affidavits he submitted in support of his post-trial motion to vacate his conviction due to an inconsistent verdict. For the first time on appeal, he also contends that the affidavits demonstrate that the jury was exposed to "extraneous prejudicial information" — specifically, complicity law discussed during voir dire — that improperly influenced its deliberations. We are not persuaded.

### 1.    Standard of Review and Applicable Law

¶ 37    The applicability of CRE 606(b) is a question of law we review de novo. *Pena-Rodriguez v. People*, 2015 CO 31, ¶ 8 (*Pena-Rodriguez I*), *rev'd on other grounds*, 580 U.S. 206 (2017) (*Pena-Rodriguez II*). CRE 606(b) provides that

> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.

¶ 38 And "[a] juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." *Id.* This no-impeachment rule "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict." *Pena-Rodriguez II*, 580 U.S. at 218.

¶ 39 CRE 606(b) provides three exceptions to this no-impeachment rule. "A juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." CRE 606(b).

## 2. Analysis

¶ 40 The parties do not dispute that the affidavits are subject to the no-impeachment rule. Shockey, however, contends that the "extraneous prejudicial information" exception applies. We disagree. The information is not "extraneous" because it was presented to the jury during voir dire as part of the judicial

24

proceedings. *See Kendrick v. Pippin*, 252 P.3d 1052, 1064 (Colo. 2011) (holding that extraneous information is legal content learned from "outside the record" or "outside of the judicial proceeding"), *abrogated on other grounds by Bedor v. Johnson*, 2013 CO 4; *accord Pena-Rodriguez I*, ¶ 16. Because he offers no other applicable exception, we reject his contention.

¶ 41     Additionally, to the extent Shockey contends the court should have granted his post-trial motion to vacate based on inconsistent verdicts, our supreme court has rejected that argument, and we are bound by its decision. *See People v. Gladney*, 250 P.3d 762, 768 n.3 (Colo. App. 2010)

### III.     Uncharged Misconduct

¶ 42     Shockey contends the trial court erred by admitting uncharged misconduct evidence based on the res gestae theory. While we agree that res gestae is no longer a viable theory of admissibility, we conclude that the evidence is intrinsic to the charged offense and is therefore admissible under *Rojas*, ¶ 52.

### A.     Additional Facts

¶ 43     Before trial, Shockey requested notice of any evidence to be admitted under CRE 404(b). The prosecution notified the defense of

25

its intent to introduce evidence that Shockey was a drug dealer, that the victim owed him twenty dollars for drugs, and that Shockey had previously punched the victim for failing to repay him.

¶ 44     At the motions hearing, the court ruled on the admissibility of this evidence based on the offer of proof and the arguments of counsel.  The court excluded certain evidence, such as evidence that Shockey had shot another person in Denver but found the remaining evidence in the offer of proof admissible as res gestae and invited the defense to submit additional information regarding the issue.  Defense counsel clarified that the court's ruling permitted the prosecution to introduce evidence "that Mr. Shockey was a drug dealer, that this incident arose from a drug debt of [twenty dollars] being owed from [the victim] to Mr. Shockey, and that other witnesses claim they saw Mr. Shockey and [the other defendant] beat up the deceased prior to this."  When the court said its ruling also covered evidence of Shockey's prior possession of a handgun, defense counsel objected to any evidence linking the handgun to four other shootings, and the court agreed that such evidence would be excluded.  Defense counsel did not submit any further information.

¶ 45     During voir dire and opening statements, defense counsel referenced Shockey's history as a drug dealer and gang member. The prosecution, in its opening statements, also described Shockey as a violent drug dealer with a long-standing history involving both the victim and the co-defendant.

¶ 46     At trial, Mayfield testified that Shockey had previously sold drugs and had beaten up the victim several weeks earlier over a drug debt.  An eyewitness testified that both Shockey and Mayfield were intimidating individuals who terrorized the neighborhood through fighting and threats.  None of the trial testimony drew an objection from the defense.

### B.     Standard of Review and Applicable Law

¶ 47     We review a trial court's evidentiary ruling for an abuse of discretion.  *People v. Miller*, 2024 COA 66, ¶ 40.  A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair.  *Id.*  Preserved evidentiary errors are reviewed under the harmless error standard.  *Rojas*, ¶ 53.  We review unpreserved errors for plain error.  *See People v. Leyba*, 2019 COA 144, ¶ 55, *aff'd*, 2021 CO 54.  Reversal under this standard requires that the error be obvious and so undermine the fundamental fairness of the

trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Walker*, 2022 COA 15, ¶ 28.

¶ 48    In *Rojas*, our supreme court abolished the res gestae doctrine in Colorado and, in its place, adopted an intrinsic-extrinsic framework. *Rojas*, ¶ 52. To determine the admissibility of uncharged misconduct evidence, we must first determine whether the acts are intrinsic or extrinsic to the charged offenses. *Id.* "Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it." *Id.* Because intrinsic acts are not considered "other" crimes, wrongs, or acts, a trial court does not need to conduct a CRE 404(b) analysis before admitting such evidence. *Id.* Instead, the admissibility of intrinsic evidence is evaluated under CRE 401-403 and other ordinary evidentiary principles. *Id.*

¶ 49    In contrast, extrinsic evidence that suggests bad character may be admitted only under CRE 404(b) and after a *Spoto* analysis. *Id.*; *People v. Spoto*, 795 P.2d 1314, 1318-19 (Colo. 1990). But if extrinsic evidence does not suggest bad character, CRE 404(b) does

28

not apply, and admissibility is governed by CRE 401-403 and ordinary evidentiary principles. *Id.*

### C.    Analysis

¶ 50     To the extent the parties dispute preservation, we need not resolve this issue because, even assuming preservation, we discern no abuse of discretion in admitting this evidence and conclude that it is intrinsic to the charged offense for three reasons. First, evidence that Shockey was a drug dealer and had, weeks earlier, beaten up the victim over a drug debt was relevant to identity. It made it more likely that Shockey, rather than Mayfield, was the shooter in this instance, where the victim again owed him money for drugs.

¶ 51     Second, the evidence clarified the relationships among the parties, was close in time to the charged offense, and established a motive for the crime — all factors supporting the element of identity. Notably, the court did not enter a pretrial ruling concerning gang evidence; defense counsel first introduced that topic during opening statements.

¶ 52     Finally, evidence that Shockey carried a gun — though not inherently unlawful — was also relevant to establishing Shockey's

identity as the shooter. Indeed, Shockey concedes in his opening brief that the evidence "went to the central issue of identity."

¶ 53 While we acknowledge that the evidence was inherently prejudicial to Shockey, we conclude that its probative value was not outweighed by the danger of unfair prejudice under CRE 403, because the shooter's identity was the critical issue for the jury's decision. "[U]nfair prejudice within the meaning of the rule still refers only to 'an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis' and does not mean prejudice that results from the legitimate probative force of the evidence." *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002) (citation omitted). And when we review a trial court's ruling under CRE 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Clark*, 2015 COA 44, ¶ 18 (citation omitted). The jury's conclusion that Shockey did not use or possess the gun shows that the uncharged misconduct was not overly prejudicial.

¶ 54 Finally, Shockey faults the court for failing to issue a limiting instruction, claiming its absence allowed the jury to convict on an

improper basis. But he never requested a limiting instruction and does not develop this argument, so we do not address it further. *See Davis v. People*, 2013 CO 57, ¶ 21 (stating that a trial court doesn't have a "duty" to provide a cautionary instruction sua sponte when one isn't requested by counsel or required by statute, and under these circumstances, the lack of a limiting instruction "does not constitute reversible error"); *People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003) (declining to consider "a bald legal proposition presented without argument or development"). In the end, the jury's decision to acquit Shockey of the most serious charge indicates "that the jurors exercised some discretion in their deliberations and did not blindly convict the defendant based upon [improper] inferences." *Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987). Accordingly, we discern no abuse of discretion in the admission of this evidence.

## IV.     Restitution

¶ 55     Shockey's final argument is that the trial court's restitution order lacks sufficient evidentiary support because the prosecution did not show that disclosing the identity or location of a provider

would pose a threat to the safety or welfare of the victim. We are not persuaded.

## A. Additional Facts

¶ 56 Before sentencing, the prosecution submitted a request for restitution that included $11,302 paid by the Crime Victim's Compensation Board (Board). The Board's payment summary redacted the names of the providers.

¶ 57 At sentencing, defense counsel asked to reserve comment on the restitution matter because counsel intended to file a written objection. The court agreed and granted Shockey fourteen days to file any objection.

¶ 58 When Shockey failed to file a written objection, the trial court granted the prosecution's request for restitution.

## B. Standard of Review and Applicable Law

¶ 59 In the restitution context, we review for clear error the trial court's determination that the defendant proximately caused the victim's losses. *Martinez v. People*, 2024 CO 6M, ¶ 32. But when, as here, a defendant challenges the sufficiency of the evidence supporting the amount of restitution — that is, a challenge to the quantum of evidence provided to the court — our review is de novo.

*See id.* at ¶¶ 19-22; *People v. Moss*, 2022 COA 92, ¶ 11; *People v. Weeks*, 2021 CO 75, ¶ 24; *People v. Roddy*, 2021 CO 74, ¶ 23.

¶ 60 Restitution means "any pecuniary loss suffered by a victim [that was] . . . proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." § 18-1.3-602(3)(a), C.R.S. 2025. Crime victims may seek compensation from the Board for losses resulting from criminal conduct, including medical and hospital expenses. §§ 24-4.1-102(1), -108, -109(1)(a), C.R.S. 2025. When the Board pays a victim compensation claim, it is considered a "[v]ictim" under the restitution statute. § 18-1.3-602(4)(a)(IV). Therefore, if the Board pays a claim, the court may order the defendant to reimburse the Board for the amount of assistance it paid. *People v. Fregosi*, 2024 COA 6, ¶ 43.

¶ 61 "The prosecution must prove by a preponderance of the evidence that the defendant's conduct proximately caused the victim's loss and the amount of that loss." *Id.* at ¶ 44. However, for Board claims, the restitution statute creates a rebuttable presumption that the amount paid by the Board is a direct result of the defendant's criminal conduct. *See* § 18-1.3-603(10)(a), C.R.S.

2024; *People v. Henry*, 2018 COA 48M, ¶ 17. Specifically, section 18-1.3-603(10)(a) provides that if the Board provides aid on behalf of a victim, "the amount of assistance provided and requested by the crime victim compensation board is presumed to be a direct result of the defendant's criminal conduct and must be considered by the court in determining the amount of restitution ordered."

¶ 62 To trigger the rebuttable presumption, the prosecution must establish the amount of assistance provided. *People v. Martinez-Chavez*, 2020 COA 39, ¶ 20. The restitution statute prescribes two ways of establishing this amount: (1) "[a] list of the amount of money paid to each provider"; or (2) "[i]f the identity or location of a provider would pose a threat to the safety or welfare of the victim, summary data reflecting what total payments were made for" by category. § 18-1.3-603(10)(b)(I), (II)(A)-(E).

¶ 63 The prosecution may also prove the amount of restitution through "victim impact statements or other means." § 18-1.3-603(2)(a); *People v. Barbre*, 2018 COA 123, ¶ 40 (noting that "under Colorado law, an award of restitution may be based solely on a victim impact statement"). The court "shall base its order for

restitution" on the information presented by the prosecution. § 18-1.3-603(2)(a).

¶ 64     Any failure to comply with these provisions bars the trial court from awarding restitution. *Barbre*, ¶ 45.

## C.     Analysis

¶ 65     We begin by noting that Shockey does not contest the trial court's findings on proximate cause or the amount of restitution. Rather, he asserts that the prosecution failed to provide sufficient evidence to support the restitution award because (1) it relied exclusively on the Board's payment summary, which redacted the identity of the victim's treatment providers, and (2) it did not establish that disclosing those providers would pose a threat to the victim's safety or welfare. The problem with Shockey's argument is that the trial court gave him an opportunity to challenge restitution on this basis and he failed to avail himself of that opportunity because he never filed a written objection. Under these circumstances, Shockey waived any argument that the prosecution was required to show that identifying the provider would endanger the victim. Waiver is the intentional relinquishment of a known right or privilege. *People v. Rediger*, 2018 CO 32, ¶¶ 39-40

(explaining that a waiver extinguishes error and appellate review).

Therefore, we affirm the court's restitution order.

## V.      Disposition

¶ 66    The judgment is affirmed.

JUDGE YUN and JUSTICE MARTINEZ concur.